# TOWN OF FAIRFIELD ET AL. *v.* CONNECTICUT SITING COUNCIL ET AL.
## (15286)
## (15287)

Peters, C. J., and Borden, Berdon, Norcott and Palmer, Js.

Argued March 19—decision released July 30, 1996

*Mark F. Kohler*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellant in Docket No. 15286 (named defendant).

*Anthony M. Fitzgerald*, for the appellants in Docket No. 15287 (defendant Connecticut Light and Power Company et al.).

*Linda M. Guliuzza*, for the appellees (plaintiff Alliance to Limit Electromagnetic Radiation Today et al.).

PALMER, J. The sole issue raised by this administrative appeal is whether the plaintiffs[1] have a right of appeal from a decision of the named defendant, Connecticut Siting Council (council), denying their motions for a modification pursuant to General Statutes § 4-181a (b)[2] of the council's prior final decision granting to the

---

[1] The plaintiffs are Anne Graney, Jennifer Lindine, Santo Piro, Christine S. Piro, Stephen Stout, David S. Parker and the Alliance to Limit Electromagnetic Radiation Today. The town of Fairfield, a plaintiff in the trial court, did not appeal from the judgment rendered by that court and, accordingly, it is not a party to this appeal.

[2] General Statutes § 4-181a (b) provides: "On a showing of changed conditions, the agency may reverse or modify the final decision, at any time, at the request of any person or on the agency's own motion. The procedure set forth in this chapter for contested cases shall be applicable to any proceeding in which such reversal or modification of any final decision is to be considered. The party or parties who were the subject of the original final decision, or their successors, if known, and intervenors in the original contested case, shall be notified of the proceeding and shall be given the opportunity to participate in the proceeding. Any decision to reverse or modify a final decision shall make provision for the rights or privileges of any person who has been shown to have relied on such final decision."

defendants Connecticut Light and Power Company and United Illuminating Company (utilities) a certificate of environmental compatibility and public need (certificate) for the construction of a power line. The trial court, *Fuller, J.*, dismissed the plaintiffs' appeal, concluding that because the council's decision on the plaintiffs' motions under § 4-181a (b) was not a final decision within the meaning of General Statutes § 4-166 (3),[3] it was not appealable under General Statutes § 4-183 (a).[4] The plaintiffs appealed to the Appellate Court, which reversed the judgment of the trial court. *Fairfield* v. *Connecticut Siting Council*, 37 Conn. App. 653, 656 A.2d 1067 (1995). We granted the utilities' petition for certification,[5] and now reverse the judgment of the Appellate Court.

The relevant facts are set forth in the opinion of the Appellate Court. "In January, 1991, the [utilities] applied

[3] General Statutes § 4-166 provides in relevant part: "Definitions. As used in this chapter . . .

"(2) 'Contested case' means a proceeding, including but not restricted to rate-making, price fixing and licensing, in which the legal rights, duties or privileges of a party are required by statute to be determined by an agency after an opportunity for hearing or in which a hearing is in fact held, but does not include proceedings on a petition for a declaratory ruling under section 4-176 or hearings referred to in section 4-168;

"(3) 'Final decision' means (A) the agency determination in a contested case, (B) a declaratory ruling issued by an agency pursuant to section 4-176 or (C) an agency decision made after reconsideration. The term does not include a preliminary or intermediate ruling or order of an agency, or a ruling of an agency granting or denying a petition for reconsideration . . . ."

[4] General Statutes § 4-183 provides in relevant part: "Appeal to superior court. (a) A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the superior court as provided in this section. The filing of a petition for reconsideration is not a prerequisite to the filing of such an appeal. . . ."

[5] We granted the defendants' petitions for certification limited to the following issue: "Under the circumstances of this case, did the Appellate Court properly conclude that the decision of the Connecticut Siting Council was a final decision in a contested case under the Uniform Administrative Procedure Act?" *Fairfield* v. *Connecticut Siting Council*, 234 Conn. 911, 660 A.2d 355, 356 (1995).

to the defendant council for a certificate . . . for the construction of an electric transmission line that would be 15.3 miles in length and extend from Bridgeport to Norwalk within an existing railroad right-of-way. The application was served on all appropriate local and state officials and the hearing date was noticed in the local newspapers. A six hour contested hearing was held in the Westport town hall on April 29, 1991. On September 18, 1991, the council approved the application pursuant to General Statutes § 16-50k[6] and limited conditions of construction and operation of the proposed transmission line. No appeal was taken from this decision. The utilities have already completed a substantial portion of the project in reliance on the certificate granted by the council.

"Subsequent to September 18, 1991, and prior to May 6, 1993, numerous motions and requests seeking to open the granting of the certificate and concerning stop work orders and investigations into alternatives to the proposed construction were submitted to the council. Without holding a hearing, the council denied the motions and requests in a written decision dated May 6, 1993.

"The council found that 'the subject matter of all motions, requests, and contentions to reevaluate this case and reinvestigate issues, has already been carefully considered by the Council in deciding this application . . . on September 18, 1991. No one has introduced

---

[6] General Statutes § 16-50k provides in relevant part: "(a) Except as provided in subsection (b) of section 16-50z, no person shall exercise any right of eminent domain in contemplation of, commence the preparation of the site for, or commence the construction or supplying of a facility, or any modification of a facility, that may, as determined by the council, have a substantial adverse environmental effect, in the state without first having obtained a certificate of environmental compatibility and public need . . . issued with respect to such facility or modification by the council. Any facility with respect to which a certificate is required shall thereafter be built, maintained and operated in conformity with such certificate and any terms, limitations or conditions contained therein."

new information or facts that were not available at that time.

" 'Because of a legal expectation of finality of a decision, we must find a compelling reason to reverse our decision or reopen this proceeding. After considering each and every motion, request and contention, we find no such compelling reason.'

"Subsequent to the May 6, 1993 decision, new motions for modification under General Statutes § 4-181a (b) were filed with the council. These motions claimed that changed conditions, new information, and new technology have occurred since the council's September 18, 1991 decision.

"On June 29, 1993, the council announced that it would conduct public hearings on July 13, 1993, on the motions to open and reconsider the construction of the facility. Prior to the hearing, the council solicited written comments and consultation from the state departments of the environmental protection, health services, public utility control, economic development and transportation, and the state council on environmental quality and the state office of policy and management. The hearing on July 13, 1993, was limited to the taking of oral statements from the public and parties. The council permitted the submission of evidence and briefs, which were to be filed at the council's office on or before July 20, 1993. On July 30, 1993, the council issued a written opinion.

"It stated in part: 'In deciding these motions and requests to reopen, we acted under General Statutes § 4-181a (b) which allows us to reverse or modify a final decision on a showing of changed conditions. . . . In conclusion, we find that the subject matter of all motions, requests, and contentions to re-evaluate this case and reinvestigate issues, has already been carefully considered by the Council in deciding this application

two years ago, on September 18, 1991. We know of no new information or facts that were not available at that time that would compel us to reopen this case. We have not identified any unknown or unforeseen events or any relevant circumstances that would compel us to reopen this case. There have been no scientific or technological breakthroughs that would have altered our analysis. Our analysis remains valid today and consistent with State law and State policy, including policy from the State Department of Public Health and Addiction Services and the Department of Environmental Protection.

" 'Because of a legal expectation of finality of a decision, we must find a showing of changed conditions or a compelling reason to reopen this proceeding. After considering each and every motion, request, and contention, we find no such changed conditions or compelling reasons.'

"Commissioner Paulann H. Sheets filed a six page dissenting opinion concluding that there were changed conditions and that a rehearing should take place. That rehearing she felt should reexamine the decision in light of the changed conditions and modify it appropriately if the evidence warranted.

"From the July 30 decision, the town of Fairfield, the Alliance to Limit Electromagnetic Radiation Today (A.L.E.R.T.), Ann Graney, Santo Piro, Christine Piro, Jennifer Lindine, Spencer Stout and David S. Parker appealed to the Superior Court alleging that the council, '[i]n denying the motions for revocation, reconsideration, amendment and/or modification, acted illegally, arbitrarily and in abuse of the discretion vested in it in that: a. its decision is clearly erroneous in view of the reliable, probative and substantial evidence on the whole record; b. it failed to adequately notice the public hearing held July 13, 1993, in violation of the federal

and state constitutions and state statutory provisions; c. it failed to employ the procedures for contested cases, in violation of General Statutes § 4-181a (b); d. it considered the effect of 'changed conditions' in the absence of a full evidentiary hearing; e. it relied, in error, upon the comments of the department of public health and addiction services in rendering its decision; f. it failed to consider the project's effects upon historic resources, aesthetics, the environment, property values and health; and g. it erred in denying party status to the plaintiffs, A.L.E.R.T., David S. Parker and Town of Fairfield, in violation of State Statutory provisions.'

"The council and the utilities then each filed a motion to dismiss. Each motion was based on the trial court's lack of jurisdiction. The trial court granted each motion ruling that, in a hearing held under § 4-181a (b), there is no automatic right to an appeal and that, even though the council had held a hearing, it had not been required to do so under the statute and could have denied the motions without one. It further found that since no hearing was required by the statute, denial of the motions did not create the right to appeal and cited *Summit Hydropower Partnership* v. *Commissioner of Environmental Protection*, 226 Conn. 792, 629 A.2d 367 (1993).

"The trial court further found that motions for reconsideration, reversal or modification of any final decision are governed by the requirements for contested cases. General Statutes § 4-181a (b). The agency's consideration of the motions was not a 'contested case' under § 4-166 (2) and, since no hearing was required, it was not an 'agency determination in a contested case' and not a 'final decision' under § 4-166 (3). As previously stated, the definition of 'final decision' includes 'an agency *decision* made after reconsideration.' (Emphasis added.) The ruling of an agency granting or denying a petition for reconsideration is, however, expressly

excluded from the definition of 'final decision' in § 4-166 (3)." *Fairfield* v. *Connecticut Siting Council*, supra, 37 Conn. App. 655–59.

On appeal, the Appellate Court concluded, contrary to the determination of the trial court, that the council, in denying the plaintiffs' request for a modification of its original decision, had considered the merits of the plaintiffs' motions, thereby giving rise to a proceeding in which the council was required, under § 4-181a (b), to follow the procedure mandated by the Uniform Administrative Procedure Act (UAPA); General Statutes § 4-166 et seq.; for contested cases. The Appellate Court further concluded that the council's denial of the plaintiffs' motions constituted an appealable final decision under § 4-166 (3) (A) because the council had conducted a properly noticed hearing on the motions under § 4-181a (b). This certified appeal followed.

The defendants contend that the trial court properly dismissed the plaintiffs' appeal. The defendants argue that the council's decision following the July 13, 1993 hearing was not an appealable final decision under the UAPA because the scope of the council's review of the plaintiffs' § 4-181a (b) motions was limited to a determination of *whether* to open and reconsider its earlier final decision. The plaintiffs, on the other hand, contend that the Appellate Court properly concluded that the council had considered the merits of their request under § 4-181a (b) and, therefore, that the decision of the council constituted an "agency determination in a contested case" within the meaning of § 4-166 (3) (A). We agree with the defendants.

"There is no absolute right of appeal to the courts from a decision of an administrative agency." *Lewis* v. *Gaming Policy Board*, 224 Conn. 693, 699, 620 A.2d 780 (1993); see also *Summit Hydropower Partnership* v. *Commissioner of Environmental Protection*, supra,

226 Conn. 799; *Connecticut Bank & Trust Co.* v. *Commission on Human Rights & Opportunities*, 202 Conn. 150, 154, 520 A.2d 186 (1987). "The appealability of an agency decision is governed by § 4-183 (a) of the UAPA, which provides [in part] that '[a] person who has exhausted all administrative remedies available within the agency and who is aggrieved by a *final decision* may appeal to the superior court as provided in this section.' . . . Accordingly, we have consistently held that the Superior Court has jurisdiction only over appeals from a 'final decision' of an administrative agency. See, e.g., *State* v. *State Employees' Review Board*, 231 Conn. 391, 400 n.13, 650 A.2d 158 (1994); *Summit Hydropower Partnership* v. *Commissioner of Environmental Protection*, supra, 811–12." (Emphasis in original.) *Derwin* v. *State Employees Retirement Commission*, 234 Conn. 411, 418, 661 A.2d 1025 (1995). Under § 4-166 (3), the term " '[f]inal decision' means (A) the agency determination in a contested case, (B) a declaratory ruling issued by an agency pursuant to section 4-176 or (C) an agency decision made after reconsideration. The term does not include a preliminary or intermediate ruling or order of an agency, or a ruling of an agency granting or denying a petition for reconsideration." Finally, "[t]he test for determining contested case status has been well established and requires an inquiry into three criteria, to wit: (1) whether a legal right, duty or privilege is at issue, (2) and is statutorily required to be determined by the agency, (3) through an opportunity for hearing or in which a hearing is in fact held." (Internal quotation marks omitted.) *Summit Hydropower Partnership* v. *Commissioner of Environmental Protection*, supra, 800–801.

The determination of whether an agency's decision on a motion filed pursuant to § 4-181a (b) gives rise to a contested case hinges on whether the agency has conducted a proceeding "in which such . . . modifica-

tion . . . is . . . considered." General Statutes § 4-181a (b). Thus, as the parties agree, the proper characterization of the proceedings before the council depends upon whether the council actually considered and determined the plaintiffs' motions on their merits. If the purpose of the hearing conducted by the council was not to decide the substantive issues raised in the plaintiffs' request but, rather, merely to assist the council in ascertaining whether there was sufficient reason to entertain reconsideration of its prior decision, then the council has not made "an agency determination in a contested case."[7]

As a matter of statutory construction, the plaintiffs do not dispute the conclusion, predicated on the express language of § 4-181a (b), that a proceeding thereunder does not give rise to a contested case unless the agency decides the merits of the request for modification. It bears emphasis that this reading of the statute is buttressed by the terms of § 4-181a (a),[8] which, in conjunc-

_____

[7] It is undisputed that the council conducted a hearing on the plaintiffs' motions under § 4-181a (b). As we have previously stated, however, the hearing does not give rise to a contested case unless the holding of a hearing was statutorily required. See *Summit Hydropower Partnership* v. *Commissioner of Environmental Protection*, supra, 226 Conn. 811. The plaintiffs have not identified any statutory provision mandating a hearing on their motions. They claim, rather, that the matter is entitled to contested case status because, under § 4-181a (b), the council considered the merits of their motions in rejecting them.

[8] General Statutes § 4-181a provides in relevant part: "Contested cases. Reconsideration. Modification. (a) (1) Unless otherwise provided by law, a party in a contested case may, within fifteen days after the personal delivery or mailing of the final decision, file with the agency a petition for reconsideration of the decision on the ground that: (A) An error of fact or law should be corrected; (B) new evidence has been discovered which materially affects the merits of the case and which for good reasons was not presented in the agency proceeding; or (C) other good cause for reconsideration has been shown. Within twenty-five days of the filing of the petition, the agency shall decide whether to reconsider the final decision. The failure of the agency to make that determination within twenty-five days of such filing shall constitute a denial of the petition. (2) Within forty days of the personal delivery or mailing of the final decision, the agency, regardless of whether

tion with § 4-166 (3); see footnote 3; prescribes the procedure to be followed by a party to a contested case who, within fifteen days of the rendering of a final decision by the agency, wishes to seek reconsideration of that decision. Those provisions, like those under § 4-181a (b), contemplate a two-step procedure for reconsideration requests. Under § 4-181a (a), a party may file a petition for reconsideration with the agency on one of three specified grounds. If the agency grants the request for reconsideration, the agency is then required to conduct additional proceedings "as may be necessary to render a decision modifying, affirming or reversing the final decision." General Statutes § 4-181a (a). The preliminary decision of the agency whether to grant or deny the reconsideration petition is, however, specifically excluded from the definition of "final decision" under the UAPA and, consequently, that initial determination is not appealable to the Superior Court. General Statutes § 4-166 (3). An agency's preliminary decision whether to entertain a petition under § 4-181a (b) is, for present purposes, in all material respects identical to an agency's preliminary decision whether to entertain a petition for reconsideration under § 4-181a (a). Thus, as the trial court noted, there is no reason why, for purposes of appeal, a petition filed under subsection (b) of § 4-181a should be treated differently from a petition submitted under § 4-181a (a).

We now turn to the question of whether the hearing conducted by the council was held for the purpose of rendering a preliminary determination of whether to open its prior final decision, as the defendants claim, or, rather, to consider and decide the merits of the

a petition for reconsideration has been filed, may decide to reconsider the final decision. (3) If the agency decides to reconsider a final decision, pursuant to subdivision (1) or (2) of this subsection, the agency shall proceed in a reasonable time to conduct such additional proceedings as may be necessary to render a decision modifying, affirming, or reversing the final decision. . . ."

request for modification, as the plaintiffs claim. We agree with the defendants' characterization of the council proceedings.

Our review of the record reveals that the July 13, 1993 hearing was limited solely to the question of whether the plaintiffs had made a sufficient allegation of changed circumstances to warrant a further hearing by the council on the merits of the plaintiffs' motions to open its prior final decision. In his opening statement at the hearing, the council chairman informed all those who were present that "[a]t this hearing, the Council will receive testimony on the technical and legal reasons *to reopen* this proceeding." (Emphasis added.) The council, in its memorandum of decision, described the hearing as one in which "the Connecticut Siting Council . . . *considered motions and requests to reopen, stop work, reconsider, revoke or amend* the Certificate," and concluded that "[w]e know of no new information or facts that were not available at that time *that would compel us to reopen* this case. . . . [W]e must find a showing of changed conditions or a compelling reason to reopen this proceeding. . . . [W]e find no such changed conditions or compelling reasons." (Emphasis added.) The memorandum further stated that "[e]*ven if [the council] were to reopen this proceeding at this time*, such a reopening would not be productive because there is no new scientific or technical information that would help resolve this global issue."[9] (Emphasis added.) Even the dissenting council member who voted to grant the plaintiffs' motions to open and reconsider the council's prior final decision, stated that "[a]n evidentiary hearing should be convened pursuant to [§] 4-181a (b) to re-examine that decision in light of the

---

[9] The mere fact that the council heard testimony concerning changed conditions does not alter the fundamental purpose of the hearing as expressed by its members.

changed conditions and to modify it appropriately if the evidence warrants."

In light of these clear and consistent expressions of intent by the members of the council, we are persuaded, as was the trial court, that the hearing held by the council was conducted solely to determine whether reconsideration of its prior final decision was warranted. Once the council resolved that question against the plaintiffs, no further hearing was necessary. Accordingly, we conclude that the proceeding on the plaintiffs' motions under § 4-181a (b) did not give rise to a contested case within the meaning of the UAPA and, therefore, that the council's denial of the plaintiffs' motions was not appealable to the Superior Court.

The Appellate Court found support for its contrary conclusion in the fact that the council had caused notice of the hearing to be served on interested parties and, in addition, had solicited comments from other agencies. That the agency conducted a hearing to consider the question of whether to open its prior final decision does not transform its review of the matter into a contested case. Indeed, as we have stated in a similar context; see, e.g., *Derwin* v. *State Employees Retirement Commission*, supra, 234 Conn. 423–24 n.14; to hold otherwise would discourage agencies from voluntarily holding hearings on petitions for modification under § 4-181a (b) lest the agency's preliminary determination be deemed to create an appealable contested case.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion PETERS, C. J., and BORDEN and NORCOTT, Js., concurred.

BERDON, J., concurring. I agree with the majority that the Superior Court lacks jurisdiction to entertain

an appeal by the plaintiff[1] Alliance to Limit Electromagnetic Radiation Today (A.L.E.R.T.) from the decision of the defendant Connecticut Siting Council (council) not to reconsider its prior final decision. The council had previously issued a certificate of need and environmental compatibility to the defendants United Illuminating Company and Connecticut Light and Power Company (utilities) to construct a new 115kv transmission line between Bridgeport and Norwalk, notwithstanding concerns that exposure to electromagnetic frequency (EMF) could be a health hazard. I write separately, however, to highlight the significant consequences of the failure to grant courts jurisdiction in cases such as this where sensitive environmental issues are raised. Presently, the law furnishes no remedy to plaintiffs, such as A.L.E.R.T., to challenge an agency's determination that there is insufficient evidence to reconsider a decision due to a change in circumstances that could substantially affect the health and welfare of the public.

In this case, the dissenting opinion filed by Paulann Sheets, one of the council commissioners, underscores the serious health and environmental issues involved in this question.[2] Sheets observed that since the council's original decision in 1991 authorizing the two utilities to construct electric power lines, evidence has come to light that EMF exposure could "pose a real [and] potentially lethal hazard" to the public, including a risk of cancer to children. In her opinion, Sheets noted that numerous reports had recently circulated regarding the dangers posed by electric power lines, and that concern surrounding this issue has prompted Congress to appropriate $65 million over the next five years to research the effects of EMFs. Sheets also cited a report issued

[1] There were also six individual plaintiffs involved in the appeal from the Superior Court. See footnote 1 of the majority opinion.
[2] See footnote 3.

by the Connecticut Interagency Task Force on EMF Exposures in March, 1993, that provided: " 'Based on the results from the Swedish studies linking childhood cancers to proximity of high voltage transmission lines, the Swedish government has acknowledged the link between cancer and EMF as real. Policy is currently under consideration that may result in the movement of electrical lines, schools, and daycare centers.' " Furthermore, Sheets noted that "[a] substantial perception by the public exists in the Bridgeport to Norwalk area along the new power line that hundreds of people are exposed to and are powerless to shield themselves or their children from a potentially lethal health hazard. This fearful perception can be in and of itself a hazard to health, with substantial adverse effects. This, too, is a 'changed condition' from September 18, 1991, [that] we can ameliorate by reopening [the case] . . . ."

Nevertheless, under the current state of the law, I am compelled to agree that the Superior Court does not have jurisdiction and that we must dismiss the appeal.[3]

---

[3] The full text of Sheets' dissent provides as follows: "I respectfully dissent from the Council's decision not to reopen [the council's final decision granting the joint application of the utilities for a certificate (Docket No. 141)]. Changed conditions have occurred since September 18, 1991, when this Council issued a Certificate of Need and Environmental Compatibility to United Illuminating Company and Connecticut Light and Power Company to construct a new 115kv transmission line between Bridgeport and Norwalk, CT. There [are] sufficient reasons to believe these changes affect the validity of our decision, in particular the necessary finding that the effects of the construction 'will not pose an undue hazard to persons on property along the area traversed by the line.' An evidentiary hearing should be convened pursuant to [General Statutes §] 4-181a (b) to re-examine that decision in light of the changed conditions and to modify it appropriately if the evidence warrants. In particular, the evidentiary basis supporting the Council's Best Management Practices for siting of facilities with electromagnetic frequency ('EMF') exposures should be received, subject to cross-examination, together with detailed information about the numbers and location of persons and public gathering facilities along the 115kv route; EMF from the new power line of the nature and extent of the exposure and means of reducing that exposure should be established and carried out under Council oversight. While it may be true, although I reserve judgment, that [General

Statutes § 16-50k (d)] limits the scope of the modification of the decision which the Council may direct, a position urged by the Certificate Holders, we need not determine that issue as a precondition to holding the hearing which I envision.

"Petitioners represented by Alliance to Limit Electro[m]agnetic Radiation ('A.L.E.R.T.') and others asked this Council, in effect, to reopen [Docket No. 141] for a complete rehearing. [A footnote to this paragraph provided as follows: 'Several claim they lacked adequate notice of the project or the public hearing on April 29, 1991. While their determined efforts to be heard well after we granted the Certificate lend credence to this claim, in fact, I am satisfied that the Council complied with existing notice requirements. The unhappy fact, however, is that lawful procedure may not have served justice. As the Attorney General declared to this Council, "[F]airness dictates that individuals faced with the prospect of a high voltage transmission line so near their properties be allowed to participate in the siting process." (Letter, June 20, 1993) If provision of statutorily required notice is insufficient to bring this prospect to the attention of the well prepared and confident residents of Fairfield, how much less adequate must it be for the hardpressed citizens of Bridgeport living along the railroad. It may be time to change that statute to afford personal or mailed notice to residences and schools that abut a proposed power line construction project. We can only interpret, not amend, a statute, however. Nevertheless, I note that while a hearing may not be reopened for lack of notice when all that is required for notice has been performed, as here, some part of this objection would be addressed if [Docket No. 141] is properly reconvened pursuant to Section 4-181a (b).'] There must be a compelling reason to disturb the finality of a decision like this one. The Intervenors should realize that the principle of finality which protects administrative or judicial decisions from modification for all but the most compelling reasons, e.g., public health and safety, also serves to protect the public against easy changes in decisions unwelcome to powerful vested interests, however rare such decisions may be. I do not believe the petitions before us show sufficient reason to overcome this restraint and revisit the issues of need for this power line or the impact on property, historic, and environmental values. Instead, I would re-open [Docket No. 141] in order to carry out this Council's own Best Management Practices, adopted in February, 1993, particularly Paragraph 5, and to establish an evidentiary record supporting, implementing, or modifying those practices in light of the developing body of research and emerging governmental policies on electromagnetic field exposures from power lines and substations and adverse human health effects. In particular, we should receive evidence identifying the residences, schools, and other venues where the public, especially children, spend substantial time adjacent to or within a specified distance from the 115kv power line. The Council should direct the Certificate Holders to provide mailed notice to the exposed homes and facilities and establish a procedure, in consultation with the Council and A.L.E.R.T., for measuring current and projected EMF exposures to them,

apprising them of these measurements, the factors involved, and the options available for reducing these EMF exposures.

"The 'Changed Conditions' Warranting Re-Opening of [Docket No. 141] pursuant to Section 4-181a (b)

"The following 'changed conditions' have persuaded me there is a need to reopen [Docket No. 141] for the limited purposes outlined here.

"1) Since September 18, 1991, the date of our final decision in [Docket No. 141], the public has been exposed to a crescendo of reports in the mass and some elite organs of public opinion (print and electronic) that has led a significant part of that public to conclude, not unreasonably, that electric power lines in general and the Bridgeport/Norwalk line in particular pose a real, potentially lethal hazard to themselves and their children. (e.g., See A.L.E.R.T. Video, 'National News Clips-EMF'; Brodeur, Paul, 'The Cancer at Slater School,' The New Yorker, (December 7, 1992); 'Polarized Debate EMFs and Cancer,' News & Comment, Science (December 11, 1992);

"2) Research studies published since [Docket No. 141] on the issue of EMF risks to human health have not laid to rest the issue. If anything, the accumulating evidence, although inconsistent within and between studies, (e.g., the Karlinska Institute Swedish study, September, 1992, and the Danish Cancer Registry study, October, 1992) tends to strengthen, not disprove, the earlier claimed association between EMF exposure and adverse health effects previously identified by less well-designed studies. (See ¶5 below);

"3) In October, 1992, Section 2118 of the Energy Policy Act authorized $65 million over the next five years ($6 million of which has already been appropriated) subject to a 50% 'offset' from non-federal sources, for EMF research and public communication under the [United States] Department of Energy [DOE] and National Institute for Environmental Health. DOE is mandated to ensure that no contributor of non-federal funds may influence the program. This massive federal initiative corroborates and reflects the trend toward increasing, rather than decreasing, scientific concern about possible EMF adverse health effects;

"4) In February, 1993, the Council adopted our Best Management Practices to ensure that our decisions did not unnecessarily expose individuals to EMFs while we waited for scientific research and the community of scientists to reach more definitive conclusions about the reality of EMF effects from power lines and substations on health. We were prompted to this by ongoing review of research made available to us inside and outside of our dockets. Little of this material has been entered into the record of a hearing, subject to cross-examination. The Council's position on this issue has thus significantly evolved since [the decision in another case] in 1988 when materials on EMF exposure from power lines and health concerns were first brought to the Council's attention and since [Docket No. 141], when the only testimony entered on the record, subject to cross-examination, was presented by the utilities. Regrettably, the evidentiary records of our proceedings to date very incompletely attest to this evolution and the basis for it;

"5) In March, 1993, the Connecticut Interagency Task Force [on EMF

Exposures] issued its Final Report following more than one year of investigation commissioned by the Connecticut Legislature in 1991. The Report adopted the conclusion reached in October, 1992, that 'No definitive cause and effect relationship to EMF and an increase in health risk has been established . . . . The evidence available to us at this time is not sufficient to say whether or not a risk exists.' (Letter to Senator Cornelius [P. O'Leary], October 13, 1992, adopted by the [1993] Task Force Report, p. 1-4) At the same time, the 1993 Report specifically dissented from the 1992 report of the Connecticut Academy of Science and Engineering which had 'implied' that 'exposures to EMF may be dismissed as a potentially significant public health issue. Neither [the department of health services] nor the Task Force agree with this implication.' (1993 Task Report, p. 2-2) Indeed, the Task Force clearly stated: 'Although there is no scientific consensus either on the existence or the magnitude of health risks from EMF exposure, a growing body of epidemiologic evidence is emerging that confirms this association. Biologists are working concurrently to discover and describe possible mechanisms involved in the interaction between EMF and cells. Physiological changes have been documented; whether they may lead or contribute to pathological changes has yet to be determined.' (1993 Task Report, p. 1-1)

"Nevertheless, the Task Force elected not to recommend a public policy of 'prudent avoidance,' which provides that cost effective measures be taken by manufacturers of electric appliances and by power companies to reduce EMF exposure for the public. Instead, they adopted a policy of Voluntary Exposure Control. This is described as a 'proactive program to inform the public of "EMF and factors to consider if concerned individuals decide to reduce their exposure." ' (p. 1-4) *How these decisions to reduce exposure are to be made effectively in the context of involuntary exposure to EMFs from adjacent power lines or substations was not addressed.* (Appendices E and F of the 1993 Task Force Report contain a compendium of summaries of past and current research and the broad range of scientific opinion from unequivocal disbelievers of adverse EMF health effects to convinced espousers of wide spread serious risk);

"6) This same 1993 Task Force Report noted that, 'Based on the results from the Swedish studies linking childhood cancers to proximity of high voltage transmission lines, the Swedish government has acknowledged the link between cancer and EMF as real. Policy is currently under consideration that may result in the movement of electrical lines, schools, and daycare centers.' (1993 Task Force Report, p. 2-7, citing EMF Health and Safety Digest, November-December 1992, Vol. 10, No. 10, p. 5)

"7) On July 20, 1993, the State Department of Public Health and Addiction Services ('DPHAS') notified the Council that the Karlinska Institute Swedish study, on which A.L.E.R.T. partly relies to reopen [Docket No. 141], 'has not established a definitive link between EMF and adverse effects and therefore is not sufficient reason to reopen a hearing on siting of an EMF source.' The sentence immediately following clarifies this assertion. '[T]he DPHAS does not feel that any mandated changes to our electrical distribution

system because of EMF are warranted are this time.' (DPHAS Letter to Connecticut Siting Council dated July 20, 1993) [A footnote to this paragraph provided as follows: 'I do not believe the DPHAS meant by this statement to oppose the Council's Best Management Practices and our Decision and Order in [Docket No. 141], which call for adjustments in the new 115kv transmission power line that reduce the EMF exposures from 20%—40% for 80% of the line.'] I do not interpret this letter to oppose a hearing of the type I envision, that is, to receive evidence updating the state of scientific opinion on the issues in question since we decided [Docket No. 141] and to carry out our Best Management Practices with respect to the residences and schools newly subject to EMF exposure as a result of the 115kv line between Bridgeport and Norwalk;

"8) There is new evidence that dozens of households and a middle school will be exposed to the new EMF radiation who were not informed at the time of the 1991 hearing, whose numbers and location the utilities, although the Council pressed for them, declined to produce. This new evidence, suggesting that hundreds more residences will be affected than was understood at the hearing in 1991, also amounts to a 'changed condition' under Section 4-181a (b);

"9) A substantial perception by the public exists in the Bridgeport to Norwalk area along the new power line that hundreds of people are exposed to and are powerless to shield themselves or their children from a potentially lethal health hazard. This fearful perception can be in and of itself a hazard to health, with substantial adverse effects. This, too, is a 'changed condition' from September 18, 1991, which we can ameliorate by reopening [Docket No. 141], for the limited but important practical purposes outlined in this proposal.

"The Council Has Applied the Wrong Standard of Proof

"The hardest part for the Council in addressing the petitions to reopen or not [Docket No. 141] is the inconclusive state of scientific opinion about the hazards presented by extremely low level EMF, coupled with two other facts the Interagency Task Force considered and rejected adopting the policy of 'prudent avoidance' while this uncertainty persists and this Council's own Decision and Order [in Docket No. 141], which requires measures that 'prudently avoid' unnecessary EMF exposures. Quasi-judicial/quasi-policy bodies such as the Council answer to a lower standard of proof than do scientists. In law, the analogy is to the difference between 'preponderance of the evidence' and 'clear and convincing evidence' for civil matters and 'proof-beyond a reasonable doubt' for criminal convictions. Scientists require evidence to pass something akin to the criminal standard in order to achieve their consensus. This Council is bound by law to act only on the basis of 'substantial (qualified) evidence' which, however, generally need not be 'clear and convincing,' let alone 'beyond a reasonable doubt.' Where, as here, the Council's decision continues to countenance the uncertain by undisposed of involuntary health and safety risks of the 115kv line without a procedure for further, even minimal abatement, it is adhering to the

scientific standard. I respectfully submit it does so in error. The Task Force's ambivalent position also reflects operation of the scientific standard and therefore should not be dispositive. The Decision and Order in [Docket No. 141] reflected the proper standard in 1991 but in adhering exclusively to it now, under the changed circumstances, the Council has effectively applied the inapplicable scientific standard and in so doing has misinterpreted our statutory mandate to avoid imposing an 'undue hazard' on the public.

"In conclusion, I trust [that] the public recognizes the concern of this Council for the health and safety of the public, evinced clearly in the protective constraints of Decision and Order of [Docket No. 141], with which the utilities have cooperated, including mandatory compliance with any new federal or state EMF standards. I voted for the Certificate in September, 1991, despite the troubling preliminary evidence of a link between low level EMF compared with 1988–1989, because of its uncertainty, in reliance on these features of the Decision and Order. Changed conditions as discussed above now require something more. At a minimum they require that the affected residences and schools along the Bridgeport to Norwalk new 115kv line be accorded at least additional informational protections pursuant to our 1993 Best Management Practices and such other measures as may be shown to be needed after a full evidentiary hearing. To the object that this Docket is not the forum to achieve this purpose, which I believe to be shared by all Council members, I must ask, 'If not now, when?' Moreover, if reopening [Docket No. 141] has implications for households and schools adjacent to other electric power lines in the state, then so be it. Associated costs would clearly fall within the scope of prudent expenses and investment by the utilities, includable as such in their rates." (Emphasis in original.)